**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| W. Lee Flowers & Co., Inc.<br><br>Plaintiff,<br><br>v.<br><br>Bumble Bee Foods, LLC, Tri-Union Seafoods, LLC, d/b/a Chicken of the Sea International, and Starkist Company.<br><br>Defendants. | C/A No.<br><br><br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff W. Lee Flowers & Co., Inc. ("Plaintiff"), by and through its undersigned attorneys, complains and alleges as follows. All allegations herein other than those relating directly to Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1. This action arises out of a conspiracy among Defendants to fix, raise, maintain, and/or stabilize prices for packaged seafood products within the United States in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and laws of South Carolina prohibiting contracts or agreements in restraint of trade (S.C. Code Ann. §§ 39-3-10, *et seq.*) and unfair trade practices (S.C. Code Ann. §§ 39-5-10, *et seq.*).

## RELEVANT MARKET AND RELEVANT PERIOD

2. The relevant product market under Plaintiff's Sherman Act and state law claims is shelf-stable packaged seafood products (specifically tuna) that are sold in cans, pouches, or ready-to-eat serving packages. The relevant geographic market is the United States, including the state of South Carolina.

1

3. The Relevant Period of the conspiracy alleged herein begins no later than January 1, 2010, and continues to the present.

## JURISDICTION AND VENUE

4. This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Section 1 of the Sherman Act (15 U.S.C. § 1). This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). Plaintiff also asserts claims under South Carolina law that are cognizable under this Court's supplemental jurisdiction. 28 U.S.C. § 1367(a).

5. Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) and 28 U.S.C. § 139l(b), (c), and (d) because Defendants transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6. This Court has personal jurisdiction over Defendants because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered packaged seafood products in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

7. Plaintiff W. Lee Flowers & Co., Inc. ("Plaintiff") is a corporation organized, existing, and doing business under the laws of South Carolina with its principal place of business at 127 E. W. Lee Flowers Road, Scranton, SC 29591. During the Relevant Period, Plaintiff directly purchased packaged seafood products from one or more of the Defendants and has suffered pecuniary injury as a result of the federal antitrust and other state law violations alleged herein.

## DEFENDANTS

8. Defendant Bumble Bee Foods, LLC ("Bumble Bee") is a Delaware limited liability company with its principal place of business located at 280 10th Avenue, San Diego, California 92101. Bumble Bee is privately owned by Lion Capital ("Lion"), based in the United Kingdom.

9. Defendant Tri-Union Seafoods, LLC, doing business as Chicken of the Sea International, Inc. ("Tri-Union" or "Chicken of the Sea") is a California limited liability company with its principal place of business located at 9330 Scranton Road, Suite 500, San Diego, California 92121. Tri-Union is owned by Thai Union Frozen Products ("Thai Union"), a company based in Thailand.

10. Defendant StarKist Company ("StarKist") is a Delaware corporation with its principal place of business at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212. StarKist is privately owned by Dongwon Industries, a company based in South Korea.

**UNNAMED CO-CONSPIRATORS**

11. On information and belief, at all relevant times, other producers of packaged seafood products willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against Defendants are also averred against these unnamed co-conspirators.

**AGENTS**

12. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**INTERSTATE TRADE AND COMMERCE**

13. Throughout the Relevant Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of packaged seafood products in interstate commerce between and among offices of Defendants and their customers located throughout the United States.

14. Throughout the Relevant Period, Defendants transported substantial amounts of packaged seafood products in a continuous and uninterrupted flow of interstate commerce throughout the United States.

15. Throughout the Relevant Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

**FACTUAL ALLEGATIONS**

16. Defendants sell packaged seafood products to various retail outlets throughout the United States, including in this district.

17.     Defendants are the three largest domestic manufacturers of packaged seafood products. The industry is highly concentrated. The Defendants' combined share of the canned tuna market in the United States approaches or exceeds 80%. Sales of canned tuna make up approximately 73% of the market for packaged seafood products sold in United States. The portion of the market not controlled by Defendants is divided among a number of private label brands.

18.     By virtue of their large combined market share and the existence of significant barriers to entry, the Defendants together possess market power in the relevant market.

19.     In December 2014, Thai Union announced the proposed acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion.

20.     On or about July 23, 2015, Thai Union suspended a preferential public offering previously announced to fund the Bumble Bee acquisition in light of an investigation of the packaged seafood industry commenced by the United States Department of Justice ("DOJ"). Thai Union disclosed on July 23, 2015, that various seafood producers had received subpoenas relating to the DOJ's investigation.

21.     On December 3, 2015, the DOJ announced that Thai Union and Bumble Bee had abandoned their plans to merge after the DOJ informed the companies that it had serious concerns that the proposed transaction would harm competition.

22.     Assistant Attorney General William J. Baer of the DOJ's Antitrust Division stated that "[o]ur investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse."

5

23. In the fall of 2015, at least one news source reported that during the course of the DOJ's review of the proposed Bumble Bee acquisition, evidence of a cartel was uncovered and that Chicken of the Sea sought "Type B" leniency in which the DOJ first uncovers wrongdoing and then uses the Type B leniency applicant's cooperation to assist the DOJ in building its case against the other members of the conspiracy.

24. Under DOJ policies, for an applicant to be granted any type of immunity from criminal conviction from the DOJ, the applicant must admit a criminal violation of antitrust laws by the corporation. The applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.

25. As a condition of Type B leniency, the leniency applicant must also admit that the confession of wrongdoing is truly a corporate act as opposed to isolated confessions of individual executives or officials.

26. Plaintiff, therefore, alleges on information and belief that one Defendant has confessed its participation in the conspiracy alleged herein and that others, including the other Defendants herein named, participated in it.

27. There are economic indications that support the conclusion that there was collusive pricing within the domestic packaged seafood industry.

28. Consumption of packaged seafood, particularly canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. This trend has been widely reported.

29. A 2014 article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this chart, showing that while Americans are buying less canned seafood, they are paying more for what they do buy:



30.     Similarly, the National Marine Fisheries Service reported the following consumption trends for canned seafood from 1985 to 2013:

7

**U.S. ANNUAL PER CAPITA CONSUMPTION OF CANNED FISHERY PRODUCTS, 1985-2013**

| Year | Salmon | Sardines | Tuna | Shellfish | Other | Total |
|------|--------|----------|------|-----------|-------|-------|
|      |        |          | Pounds |         |       |       |
| 1985 | 0.5 | 0.3 | 3.3 | 0.5 | 0.4 | 5.0 |
| 1986 | 0.5 | 0.3 | 3.6 | 0.5 | 0.5 | 5.4 |
| 1987 | 0.4 | 0.3 | 3.5 | 0.5 | 0.5 | 5.2 |
| 1988 | 0.3 | 0.3 | 3.6 | 0.4 | 0.3 | 4.9 |
| 1989 | 0.3 | 0.3 | 3.9 | 0.4 | 0.2 | 5.1 |
| 1990 | 0.4 | 0.3 | 3.7 | 0.3 | 0.4 | 5.1 |
| 1991 | 0.5 | 0.2 | 3.6 | 0.4 | 0.2 | 4.9 |
| 1992 | 0.5 | 0.2 | 3.5 | 0.3 | 0.1 | 4.6 |
| 1993 | 0.4 | 0.2 | 3.5 | 0.3 | 0.1 | 4.5 |
| 1994 | 0.4 | 0.2 | 3.3 | 0.3 | 0.3 | 4.5 |
| 1995 | 0.5 | 0.2 | 3.4 | 0.3 | 0.3 | 4.7 |
| 1996 | 0.5 | 0.2 | 3.2 | 0.3 | 0.3 | 4.5 |
| 1997 | 0.4 | 0.2 | 3.1 | 0.3 | 0.4 | 4.4 |
| 1998 | 0.3 | 0.2 | 3.4 | 0.3 | 0.2 | 4.4 |
| 1999 | 0.3 | 0.2 | 3.5 | 0.4 | 0.3 | 4.7 |
| 2000 | 0.3 | 0.2 | 3.5 | 0.3 | 0.4 | 4.7 |
| 2001 | 0.4 | 0.2 | 2.9 | 0.3 | 0.4 | 4.2 |
| 2002 | 0.5 | 0.1 | 3.1 | 0.3 | 0.3 | 4.3 |
| 2003 | 0.4 | 0.1 | 3.4 | 0.4 | 0.3 | 4.6 |
| 2004 | 0.3 | 0.1 | 3.3 | 0.4 | 0.4 | 4.5 |
| 2005 | 0.4 | 0.1 | 3.1 | 0.4 | 0.3 | 4.3 |
| 2006 | 0.2 | 0.2 | 2.9 | 0.4 | 0.2 | 3.9 |
| 2007 | 0.3 | 0.2 | 2.7 | 0.4 | 0.3 | 3.9 |
| 2008 | 0.1 | 0.2 | 2.8 | 0.4 | 0.4 | 3.9 |
| 2009 | 0.2 | 0.2 | 2.5 | 0.4 | 0.4 | 3.7 |
| 2010 | 0.2 | 0.2 | 2.7 | 0.4 | 0.4 | 3.9 |
| 2011 | 0.2 | 0.2 | 2.6 | 0.4 | 0.4 | 3.8 |
| 2012 | 0.2 | 0.2 | 2.4 | 0.4 | 0.4 | 3.6 |
| 2013 | 0.4 | 0.2 | 2.3 | 0.4 | 0.4 | 3.7 |

31.     Given this decline in consumption of canned seafood, one would reasonably expect rational businesses to reduce the prices for packaged seafood, but Defendants did not. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted United States city average prices for shelf-stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.

8



32.     One method by which the Defendants collusively raised prices was by decreasing the size of cans of tuna without also decreasing prices.  By July 2010, and reportedly beginning earlier, Bumble Bee, Chicken of the Sea, and StarKist had replaced their 6 oz. cans of tuna with 5 oz. cans.   Also, by June 2011, the volume of tuna contained within the cans was less than 3 ounces, with the remaining volume comprised of water, hydrolyzed protein, flavorings, etc.

33.     Raw material costs do not adequately explain the price increases. The global catch of skipjack and other species of tuna steadily increased over the decades from 1961 to 2013, and periods of the declining fish prices in 2009, 2013, and 2014 did not result in corresponding decreases in prices for packaged seafood in the United States market.

34.     Upon information and belief, in approximately March and June 2011, Defendants StarKist, Bumble Bee, and Chicken of the Sea announced price increases on packaged tuna products, and between approximately December 2011 and January 2012, Defendants StarKist, Bumble Bee, and Chicken of the Sea increased prices of packaged tuna products sold in the United States. Moody's reported in April 2012 that "[i]n 2011, Bumble Bee demonstrated a willingness to implement necessary price increases to maintain margins at the expense of its

9

volumes." *See* https://www.moodys.com/research/Moodys-changes-Bumble-Bees-outlook-to-negative-from-stable-affirms--PR_243446.

35. Defendants had both the motive and opportunity to conspire to raise and stabilize prices for domestic packaged seafood products through their regular attendance at numerous meetings of industry groups and trade associations.

36. *Undercurrent News* reported that even prior to the proposed merger, Chicken of the Sea and Bumble Bee "already co-operate on processing." By December 2014, Bumble Bee and Chicken of the Sea already had co-packing agreements in which Bumble Bee's factory in Santa Fe Springs, California would pack and can tuna for Chicken of the Sea's West Coast operations, and Chicken of the Sea's plant in Georgia packed canned tuna for Bumble Bee's East Coast operations. *See* https://www.undercurrentnews.com/2014/12/19/can-thai-union-bumble-bee-tie-up-reverse-us-tuna-consumption-decline/.

37. Defendants StarKist and Chicken of the Sea share the same supplier. Tri Marine International, LLC ("Tri Marine"), an integrated tuna harvesting, purchasing, processing and trading group of companies headquartered in Bellevue, Washington, partners with both Chicken of the Sea and StarKist to supply tuna. Tri Marine and fleet owner Edmund Gann owned 50% of Chicken of the Sea International until it was sold to Thai Union in 2000. *See* https://www.undercurrentnews.com/2014/12/19/can-thai-union-bumble-bee-tie-up-reverse-us-tuna-consumption-decline/.

38. The United States packaged tuna products industry is highly concentrated and has been so for many years. The industry is an oligopoly with the same, small number of producers or sellers dominating the industry for many years.

39. Packaged tuna products are commodity products and possess commodity-like characteristics. The product of one seller is interchangeable with the product of another.

40. There are substantial barriers to entry in the packaged tuna products industry, including high start-up costs, manufacturing expertise, access to tuna fleets, fishing operations and other raw materials, access to operations of tuna processing facilities in the South Pacific and United States, access to distribution channels, and compliance with regulatory requirements.

## TOLLING OF THE STATUTE OF LIMITATIONS

41. Plaintiff had neither actual nor constructive knowledge of the facts of collusion constituting its claim for relief and did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July 2015.

42. Defendants engaged in a secret conspiracy that did not reveal facts to the public that would put Plaintiff on inquiry notice that a conspiracy to fix prices of packaged tuna products existed. Thus, Plaintiff could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ investigation.

43. Because Defendants' agreement and conspiracy was kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially inflated prices for packaged tuna products during the Relevant Period.

44. Defendants actively misled the public about the price-fixing scheme by issuing false and misleading statements concerning their reasons for price increases, none of which disclosed that Defendants had agreed among themselves to fix and raise the price of packaged tuna products.

## COUNT I
### (Price Fixing in Violation of 15 U.S.C. § 1)

45. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

46. Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the price of packaged seafood products within the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

47. The combination and conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Antitrust Act.

48. Alternatively, the combination and conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Antitrust Act.

49. Defendants intended to, and actually did, restrain trade. They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of packaged seafood products sold in the United States.

50. The conspiracy unreasonably restrained trade. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

51. Plaintiff has been injured in its business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT II
### (Violations of S.C. Code Ann. §§ 39-3-10, *et seq*.)

52. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

53. S.C. Code Ann. § 39-3-10, in pertinent part, declares unlawful all arrangements, contracts, agreements, or combinations between two or more firms made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles in South Carolina or which tend to advance or control the price to the consumer of any such product or article or which may lessen or affect in any manner the full and free competition in any prices in any branch of trade, business, or commerce.

54. The conduct of Defendants as alleged herein violates S.C. Code Ann. § 39-3-10.

55. S.C. Code Ann. § 39-3-30 provides, in pertinent part, that any person who may be injured or damaged by any such arrangement, contract, agreement, or combination described in § 39-3-10 may sue those firms responsible in any court of competent jurisdiction in South Carolina and recover the full consideration or sum paid for any goods, wares, merchandise, or articles the sale of which was controlled by such unlawful arrangement, contract, agreement, or combination.

56. Plaintiff is entitled to recover the full amount of the consideration it paid Defendants for the packaged seafood products it purchased from Defendants during the time period in which the illegal contract, agreement, arrangement, or combination was in effect.

## COUNT III
### (Violations of S.C. Code Ann. §§ 39-5-10, *et seq.*)

57. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

13

58. S.C. Code Ann. § 39-5-20(a) declares as unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

59. S.C. Code Ann. § 39-5-20(b) provides that it is the intent of the South Carolina legislature that in construing paragraph (a) of that section that the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to § 5(a)(1) of the Federal Trade Commission Act, as from time to time amended.

60. The conduct of Defendants herein alleged violates § 5(a)(1) of the Federal Trade Commission Act and also constitutes a violation of S.C. Code Ann. § 39-5-20(a).

61. The conduct of Defendants also impacts, or has the potential to impact, the public interest in that, among other things, it is capable of repetition.

62. S.C. Code Ann. § 39-5-140 provides that any person who suffers any ascertainable loss of money or property as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by § 39-5-20 may bring an action individually to recover actual damages, and if the court finds that the use or employment of the unfair or deceptive method, act, or practice was a willful or knowing violation of § 39-5-20, the court shall award three times the actual damages sustained and may provide for such other relief as it deems necessary or proper. For purposes of this section, a willful violation occurs when the party committing the violation knew or should have known that its conduct was a violation of § 39-5-20.

63. S.C. Code Ann. § 39-5-140(a) also provides that the court, upon the finding of a violation of § 39-5-20, shall award to the person bringing the action reasonable attorneys' fees and costs.

64. Defendants knew or should have known that their conduct alleged herein was a violation of § 39-5-20, and Plaintiff is entitled to an award in the amount of three times its actual damages sustained plus reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A. That the Court adjudge and decree that the contract, combination, and conspiracy alleged herein is an unreasonable restraint of trade, an unfair trade practice, and a knowing and willful use of an unfair trade practice in violation of 15 U.S.C. § 1 and S.C. Code Ann. §§ 39-3-10 and 39-5-20, respectively;

B. That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff;

C. That the Court award Plaintiff damages under both its federal and state claims in an amount to be determined at trial, including treble damages and a refund of the full purchase price of the goods Plaintiff purchased, as permitted by law;

D. That the Court award Plaintiff attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

E. That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining, or renewing the combination, conspiracy, agreement, understanding, or concert of action, or adopting any practice, plan, program, or design having a similar purpose or affect in restraining competition; and

F. That the Court award Plaintiff such other and further relief as may be deemed necessary and appropriate.

## JURY DEMAND

Plaintiff requests a jury trial on any and all claims so triable.

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

By: ___s/Manton M. Grier_____
    Manton M. Grier, D.S.C. ID No.: 2461
    Robert Y. Knowlton, D.S.C. ID No.: 2380
    Elizabeth H. Black, D.S.C. ID No.: 10088
1201 Main Street, 22nd Floor
Post Office Box 11889
Columbia, South Carolina 29211
(803) 779-3080
mgrier@hsblawfirm.com
rknowlton@hsblawfirm.com
eblack@hsblawfirm.com

Attorneys for Plaintiff W. Lee Flowers & Co., Inc.

May 9, 2016
Columbia, South Carolina

DM: 4460308 v.4